UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| United States of America,<br><br>                              Plaintiff,<br>     v.<br>Kristopher Myers,<br><br>                             Defendant. | Case No. 3:22-cr-00067-ART-CSD<br><br>ORDER |

Before the Court are Defendant Myers's Motion to Dismiss for Destruction of Evidence (ECF No. 44) and his Motion to Suppress (ECF No. 33). Myers's Motion to Dismiss for Destruction of Evidence argues that the Government violated Myers's right to due process by failing to preserve a potentially exculpatory piece of evidence, namely, a tan backpack that had contained a short-barreled rifle that Myers had claimed belonged to another person. For the reasons identified below, the Court grants Defendant's Motion to Dismiss and denies as moot his Motion to Suppress.

I. **BACKGROUND**

The following facts are drawn from the pleadings and from the evidentiary hearing held on June 25, 2024. (ECF No. 75).

Myers was arrested by the Reno Police Department ("RPD") on November 5, 2022, and charged in federal court on December 1, 2022, with Possession of an Unregistered Firearm. (ECF No. 1.)

Officers Nickel and Espinosa encountered Myers while performing a "vehicle check" in the Diamond's Casino parking lot in downtown Reno, Nevada on November 5, 2022, at approximately 10:24 p.m. When the officers initiated contact, Myers was parked and sitting in the driver's seat of his Jeep. A woman was sitting in the rear behind the passenger's seat, and the front passenger seat was empty. According to the police report, the officers initiated the "vehicle check"

1  because the Diamond's Casino is a "high crime area related to stolen vehicle" and
2  because Myers's "license plate initially showed to belong to a recreational vehicle,"
3  rather than his Jeep. (ECF No. 33-1 at 4.) Police later confirmed that the plates
4  matched Myers's Jeep. (ECF No. 33-2 at 26:20-26:40.)

5  Upon approaching the passenger side window, Officer Espinosa saw
6  various items that he believed to be drug paraphernalia on the passenger seat
7  and center console and ordered the woman in the back seat to exit the Jeep. (ECF
8  No. 33-1 at 4.) Approaching the driver's side, Officer Nickel ordered Myers to exit
9  the Jeep and then noticed several loaded firearm magazines by the driver's side
10 floorboard. (*Id.*) Officer Nickel handcuffed Myers, who he claims consented to a
11 search of his pockets. (ECF No. 33-2 at 1:32-2:23.) The officers later confirmed
12 that Myers was a felon. Myers challenges by separate motion the basis for the
13 stop, his arrest, and the search of the car. (ECF No. 33.)

14 After Myers's arrest, police discovered various ammunition by the driver's
15 seat and found a short-barreled rifle ("SBR") inside a tan backpack in the rear of
16 the Jeep. According to Officer Espinosa's report, Officer Nickel "located four pistol
17 magazines on the driver side floorboard, two glock magazines, and two Smith and
18 Wesson XD magazines." (ECF No. 33-1 at 4.) He further noted that "One S&W
19 magazine was loaded with ten 9mm rounds and the other was loaded with six 45
20 cal rounds. The glock magazines were empty." (*Id.*)

21 Officer Espinosa found the SBR in the rear of the Jeep. Officer Espinosa's
22 report states:

> I located luggage in the back compartment of the Jeep. Within the luggage was a brown backpack with a paper folder tucked next to the bag, in close proximity, containing documents belonging to the Defendant. Inside the front main compartment of the backpack I located a black short barrel AR style rifle along with three magazines.

26 (*Id.*) The report adds that no pistols were found during the search of the vehicle.
27 (*Id.*)
28 Myers told Officer Espinosa that the bag containing the SBR belonged to

2

1    another man, whom he identified by name. According to the report, Myers stated that "he traveled to Reno from Susanville with another male and female for an unknown reason." (*Id.*) Although Officer Espinosa reported that "Defendant stated he did not know the subjects well and could not remember what their names were," Officer Espinosa's body-worn camera shows that Myers identified the "unknown male" passenger by name and described him and that Officer Espinosa recorded the name in his notebook. (ECF No. 33-2 at 40:43-40:52; 48:43-49:04.) Myers told Officer Espinosa that he and the other man "had luggage inside the back of the car." (ECF No. 33-1 at 5.) Officer Espinosa's report notes that Myers told him that "the unknown male had a brown bag in the car and the bag contained an AR style short barrel rifle (SBR)." (*Id.*) Officer Espinosa's body-worn camera shows that Myers told the officers numerous times that the tan backpack containing the SBR was not his and belonged to the other man. (ECF No. 33-2 at 40:19-40:21; 48:41-48:51; 49:07-50:10.) Officer Espinosa's report noted Myers's insistence on this point, stating, "While checking around the bag, the only indicia of ownership found was that belonging to the Defendant. When asked, the Defendant was reluctant to give information relating to the rifle other than it belonged to the other unknown male." (ECF No. 33-1 at 5.) Although Officer Espinosa's report refers to the "other unknown male," his body worn camera video shows that Myers identified the other man by name, which Officer Espinoza noted in writing. (ECF No. 33-2 at 48:49-49:03.) Myers was taken into custody, initially charged in state court, and charged in federal court weeks later.

An RPD property report lists the items seized at the time of Myers's arrest. (ECF No. 33-1 at 6.) The report contains four entries. (*Id.*) The first, third, and fourth entries list firearm-related evidence and are categorized as "evidence": the SBR with three magazines, "3 9m and 1 45m magazines," and "45 and 9 misc ammo." (*Id.*) The second entry lists other items categorized for "safekeeping" with the description: "tan camo backpack/blk bag/clothes/2 key rings." (*Id.*)

3

Prosecutors discovered a year later, in November 2023, that "most of the evidence" in this case had been destroyed. (*See* ECF No. 83-10 at 6.) This revelation prompted the instant motion and a closer look at the handling of the evidence. After a hearing on the motion, the Court ordered the Government to detail "when it received materials from the Reno Police Department regarding Defendant's arrest" and its efforts to preserve evidence gathered by the Reno Police Department on the date of arrest. (ECF No. 77.) The Government responded with a declaration and exhibits which shed light on the case-related evidence that was preserved and destroyed in early 2023. (ECF No. 83.)

Shortly after Myers's arrest in November 2022, the Washoe County District Attorney and United States Attorney's Office ("USAO") coordinated Myers's prosecution and transfer of the evidence. Four days after Myers's arrest, on November 9, 2022, the state and federal prosecutor's offices began discussing whether the federal prosecutors planned to adopt the case. (ECF No. 83-2 at 6.)[1] A prosecutor in the USAO stated that she needed to have the ATF agent look at the firearm, and confirmed six days later, on November 17, 2022, that the agent "was able to look at the gun," and the USAO would indict on December 1, 2022, which it did. (*Id.* at 5-6.) The deputy district attorney assigned to the state case contacted the USAO a week later, on December 8, 2022, to confirm that Myers had been indicted federally, stating, "I have him set for prelim next week, and I wanted to confirm before I dismiss the case." (*Id.* at 4.) The federal prosecutor confirmed that Myers had been indicted. (*Id.*)

After dismissing the state charges, the deputy district attorney authorized the RPD to "release" related evidence being stored in its evidence vault. Specifically, he signed a form addressed to the RPD Evidence Custodian on

---

[1] The state prosecutor's email to the USAO included as an attachment the "PC" or probable cause statement filed in state court. (ECF No. 83-2 at 5). While the probable cause statement is not attached to the filed exhibit, it is a matter of public record. *See* Arrest Report and Declaration of Probable Cause, Case No. 22-20789, Reno Justice Court, 2 (Nov. 7, 2022).

4

December 12, 2022 that authorized "complete release" of the evidence. (ECF No. 83-10 at 7.) The form notified the RPD that the district attorney's office "no longer require[d] the retention of" all evidence in RPD custody related to Myers' state court case. (*Id.*) The box is checked on the form specifying: "Complete Release Pursuant to Your Agency's Policy." (*Id.*)

Roughly one month later, on January 18, 2023, the USAO confirmed that the tan backpack and other evidence were still in the RPD evidence vault. (ECF No. 83-4 at 3.) In an email provided by the USAO, a USAO paralegal asked the USAO prosecutor on December 13, 2022, "Have you received any additional discovery on Myers? So far I have the below[.]" (ECF 83-3 at 3.) While the items listed "below" are not included in the email, the prosecutor relayed the message to the ATF agent, Detective Mike Stewart, asking him, "Can you please confirm this is all the discovery on Myers?" (*Id.* at 2.) Agent Stewart indicated that he had confirmed using a database called "Tiburon" that the stored evidence included the firearm, magazines, ammunition, and "[t]he backpack the SBR was located in." (ECF No. 83-4 at 3.) The same day, on January 18, 2023, the USAO directed Agent Stewart to retrieve the "firearms evidence and book into ATF[.]" (ECF No. 83-5 at 3.) Agent Stewart confirmed that he would retrieve them the following day. (ECF No. 83-6 at 2.) The firearms evidence, namely the SBR and three magazines, were transferred into ATF custody that day but the backpack remained in the RPD evidence vault. (ECF No. 44-1 at 2.)

Ten months later, the USAO learned that the RPD had destroyed "most of the evidence" in this case (including the tan backpack) in February 2023. (ECF No. 44-1 at 2.) This fact came to light after the USAO learned that the RPD destroyed evidence in at least one other case. (*See* ECF No. 51 at 2 (expressing a concern that "in some of the cases adopted from the state, evidence was being destroyed or disposed of without the government's knowledge or permission").) The Government asked Detective Frank Brock to check on the evidence in this

case after learning that RPD had destroyed evidence in another case. (ECF No. 83 at 4.) When Detective Brock contacted the RPD to obtain evidence related to Myers's case, he was told that "most of the evidence … had been destroyed." (ECF No. 83-10 at 6.) The RPD evidence technician provided the letter from the state prosecutor authorizing release (*Id.* at 7) and a sheet listing the following items as having been destroyed sometime in February 2023:

1. Tan Camo Backpack/Blk Bag/Clothes/2 key rings;
2. 3 9 mm/1 .45 caliber magazines
3. .45 and 9 mm miscellaneous ammunition.

(*Id.* at 6 and 8.)

Though indicted in December 2022, Myers did not appear in federal court until May 2023, months after the tan backpack and other evidence was destroyed. Myers made his initial appearance and was appointed counsel on May 4, 2023. (ECF No. 6.) His counsel filed a standard discovery letter on May 9, which included a request for "any and all" objects that "were obtained from or belonged to the Defendant" pursuant to Federal Rule of Criminal Procedure 16(a)(1)(E). (Hearing Ex. 501 at 2.) The Government's Disclosure Statement likewise promised that it "has provided or will provide or permit the defendants to inspect and copy or photograph" all "objects" required to be disclosed under Federal Rule of Criminal Procedure 16(a)(1)(A)-(F). (ECF No. 12 at 1-2.) Between May and November 2023, the assigned prosecutor at the USAO responded to one request by defense for discovery to the RPD. (ECF No. 83-8.) It does not appear that any other efforts were made by the USAO to preserve, disclose, or allow inspection of physical evidence.

By stipulation of the parties, the trial date was continued to January 9, 2024. (ECF No. 21.) The parties' discovery stipulation required the USAO to disclose all discovery pursuant to Rule 16(a)(1)(A)-(F) sixty days before trial, which would have been on November 10, 2023. (ECF No. 22 at 2.)

Myers claims that this destruction of evidence violated his due process rights and requests dismissal of the indictment against him. (ECF No. 44.)

## II. DISCUSSION

The Due Process Clause protects defendants from the destruction of evidence that is materially or potentially exculpatory. Myers asserts a third-party defense, namely, that the tan backpack containing the SBR was not his and instead belonged to his male traveling companion. The Court finds that while that destroyed backpack was not materially exculpatory evidence, it was potentially useful and destroyed in bad faith.

### A. The backpack was not materially exculpatory.

Considering first "materially exculpatory evidence," evidence is "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Maolin*, 973 F.3d 977, 1001 (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985); *United States v. Jernigan*, 492 F.3d 1050, 1054 (9th Cir. 2007) (en banc)). In *California v. Trombetta*, 467 U.S. 479, 489 (1984), the Supreme Court held that "the government violates the defendant's right to due process if the unavailable evidence possessed 'exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *See United States v. Zaragoza-Moreira*, 780 F.3d 971, 977 (9th Cir. 2015) (citing *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993) (quoting *Trombetta*, 467 U.S. at 489)). If materially exculpatory evidence is destroyed, the "good or bad faith of the prosecution is irrelevant." *Illinois v. Fisher*, 540 U.S. 544, 547 (2004).

Because the tan backpack no longer exists, it is difficult, if not impossible, to conclude that it was materially exculpatory evidence. Materiality is viewed through a retrospective lens in light of the entire record. *Maolin*, 973 F.3d at 1001 n.17. And the "touchstone of materiality" is whether admission of the suppressed

7

1  evidence would have created a "'reasonable probability' of a different result." *Kyles v. Whitley,* 514 U.S. 419, 434 (1995) (citing *Bagley,* 473 U.S. at 682). To meet this standard, a defendant need not show that he "would more likely than not have received a different verdict with the evidence." *Id.* Instead, he must show only that "the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* (quoting *Bagley,* 473 U.S. at 678). In analyzing this question, "the withheld evidence must be analyzed 'in the context of the entire record.'" *Benn,* 283 F.3d at 1053 (quoting *Agurs,* 427 U.S. at 112). If the tan backpack belonged to Myers, it would have been inculpatory; but if, as Myers said, it belonged to the other man, it would have been exculpatory. Because the backpack's features and contents are unknown, the court cannot conclude that it was materially exculpatory evidence.

### B. The backpack was potentially useful evidence.

This case instead turns on the line of cases recognizing that the government violates a defendant's due process rights when it destroys "potentially useful" evidence in bad faith. *See Cooper,* 983 F.2d at 931 (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)) (noting the "requirement that the defendant demonstrate that the police acted in bad faith in failing to preserve the potentially useful evidence"). Evidence is "potentially useful" even when "no more can be said" of the evidence "than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood*, 488 U.S. at 57. "The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed, because without knowledge of the potential usefulness of the evidence, the evidence could not have been destroyed in bad faith." *United States v. Zaragoza-Moreira,* 780 F.3d 971, 977 (citing *Youngblood,* 488 U.S. at 56 n.*); *see also United States v. Sivilla,* 714 F.3d 1168, 1172 (9th Cir. 2013).

The tan backpack was "potentially useful evidence." "Potentially useful" is

a broader category than "material exculpatory evidence." (*Compare Maolin*, 973 F.3d at 1001 (defining "material exculpatory evidence") *with Youngblood*, 488 U.S. at 57 (defining "potentially useful evidence"). At oral argument the Government conceded that the tan backpack was potentially useful, arguing that there was no due process violation because there was no bad faith. The Government stated that it regretted that the ATF agent had retrieved only "part of the evidence." It argued that the tan backpack was relevant, important evidence and it would be important to prove at trial that the tan backpack where the SBR was found belonged to Myers. Indeed, Myers's defense was that the backpack was not his and inspection of the backpack would show as much.

The tan backpack easily clears the "potentially useful" hurdle because the SBR was found inside it and Myers repeatedly said the backpack was not his. (*See, e.g.*, ECF No. 33-2 at 40:19-40:21.) The backpack was critical to Myers's third-party defense, as reflected in Officer Espinosa's report and as the video captured on his body worn camera make clear. While some evidence must be subjected to testing in order to ascertain its exculpatory value, here a simple inspection of the backpack and its contents could have potentially confirmed who it belonged to, namely, Myers or the other man. Though the Government argues that the Myers's third-party defense was speculative, numerous facts underscore the plausibility that the SBR belonged to the other man: Myers repeatedly stated that the tan backpack was not his, he identified the other man by name, and the front passenger seat was empty, though a woman was seated in the back seat, suggesting that three people had been in the car before officers made contact.

**C. The backpack was destroyed in bad faith.**

The key question here is whether the backpack was destroyed in bad faith. As the Ninth Circuit explained in *Cooper*, "*Youngblood's* bad faith requirement dovetails with the first part of the *Trombetta* test: that the exculpatory value of the evidence be apparent before its destruction." *Cooper*, 983 F.2d. at 931. There

9

1  is no requirement that the prosecution ordered or even knew about the
2  destruction of evidence. Indeed, it is common for evidence to be destroyed as a
3  matter of course based on agency policy and unknown to prosecutors, as
4  apparently occurred here. *See Cooper,* 983 F.2d at 930 (evidence destroyed
5  "[p]ursuant to DEA policy"); *Zaragoza-Moreira,* 780 F.3d at 977 (destroyed video
6  "had been automatically recorded over within 30 to 45 days of" defendant's
7  arrest). The bad faith inquiry "turns on the government's [and its agents']
8  knowledge of the apparent exculpatory value of the evidence at the time it was
9  lost or destroyed." *Zaragoza-Moreira,* 780 F.3d at 979 (citing *Sivilla,* 714 F.3d at
10 1172). *Zaragoza-Moreira* illustrates the proposition that bad faith can occur
11 where an agent understands the exculpatory value of evidence and fails to take
12 steps to preserve it. The defendant in *Zaragoza-Moreira* was arrested at the border
13 for smuggling drugs and claimed she was acting under duress. *Id.* at 978. The
14 duress defense required her to show that she had no reasonable opportunity to
15 escape or surrender to officials. *Id.* She claimed that the destroyed video footage
16 would have shown that she attempted to gain the attention of law enforcement at
17 the border and that her travel companion was in fact a handler who was
18 controlling and supervising her. *Id.* The Ninth Circuit concluded that the district
19 court did not err in concluding that the destroyed video was "potentially useful
20 evidence" but did clearly err in finding no bad faith. *Id.*

21      The Ninth Circuit in *Zaragoza-Moreira* found that the border agent acted in
22 bad faith because she understood the apparent exculpatory value of the video in
23 light of the defendant's claimed duress defense but failed to take steps to preserve
24 it. *Id.* at 980–82. Specifically, the defendant repeatedly told the agent about her
25 duress defense and the agent asked her follow up questions, showing the agent
26 understood the impact of the claimed defense. *Id.* at 979. Despite apparently
27 understanding the importance of the video, the agent made no attempt to view or
28 preserve it before it was destroyed. *Id.* at 980. The agent also confirmed that the

alleged handler had crossed the border on the same date as the defendant, thus corroborating her statement to the agent. *Id.* Several of the agent's reports and her probable cause statement failed to mention the defendant's duress defense. *Id.* The Ninth Circuit concluded in that "[i]n light of the apparent value of the video evidence, which was known to [the border agent], her actions following Zaragoza's interview [were] sufficient to establish that she made 'a conscious effort to suppress exculpatory evidence,' thereby acting in bad faith." *Id.*

Under *Zaragoza-Moreira*, bad faith exists where the defendant alerts the government to the potentially useful, exculpatory evidence but the government, despite this knowledge, fails to take steps to preserve it. As the Government acknowledges, the common feature of cases in which courts have found bad faith is that the police, agent, and/or prosecutor "grasped the exculpatory value exculpatory value of the evidence" before it was destroyed. (ECF No. 51 at 6-7 (citing, *inter alia*, *Zaragoza-Moreira*, 789 F.3d at 979; *Cooper,* 983 F2d 929, 930). Bad faith exists when the government knew the potentially exculpatory value of the evidence and failed to take steps to preserve it. *Zaragoza-Moreira,* 789 F.3d at 979-80.

Trying to distance this case from *Zaragoza-Moreira*, the Government argues that this case is comparable to cases in which the Ninth Circuit found no bad faith. (ECF No. 51 at 7-9 (citing *United States v. Robertson,* 895 F.3d 1206, 1211-12 (9th Cir. 2018); *Sivilla,* 714 F.3d at 1172; *United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011).) None of these cases is similar to *Zaragoza-Moreira* or this case. *Robertson* concerned a letter carrier convicted of mail theft who argued that the government violated her due process rights by failing to preserve video of the employee parking lot before it was deleted. *Robertson,* 895 F.3d at 1211-12. In affirming the district court's finding that the government did not act in bad faith, the Ninth Circuit pointed to the investigating agent's testimony that he only learned about "the possibility of the parking lot video" by way of a union grievance

11

filed on behalf of the defendant that failed to explain "how or why the parking lot video might contain exculpatory evidence." *Id.* The court added that the case was unlike *Zaragoza-Moreira,* where the defendant "repeatedly alerted" the agent to her defense and the potential usefulness of the unpreserved video evidence there was "no dispute" about its potential value. *Id.* at 1212.

Neither *Sivilla* nor *Flyer* undercuts the rule in *Zaragoza-Moreira* that bad faith exists where the government fails to preserve evidence that it knows is potentially useful to the defense. In *Sivilla,* the district court ordered the government to preserve the drug-laden Jeep the defendant was driving when arrested, which the government attempted to do before the Jeep was sold and stripped for parts. *Sivilla,* 714 F.3d at 1172. The Ninth Circuit held that the government's failed attempt to preserve the evidence was negligent, not in bad faith. *Id.* In *Flyer,* a case agent "mishandled" a laptop, unintentionally corrupting data. *Flyer,* 633 F.3d at 916. In affirming the district court's finding that the government's conduct "evidenced negligence, rather than bad faith," the Ninth Circuit noted that the government voluntarily dismissed the count in the indictment relating to evidence found on the mishandled laptop. *Id.* Neither *Sivilla* nor *Flyer* addressed situations like the present case.

Bad faith exists here because the exculpatory value of the tan backpack was known to both the police and the prosecutors before it was destroyed and the prosecutor took no steps to preserve it. The Government argues that the exculpatory value of the backpack was speculative and that the Government's conduct did not rise to the level of bad faith because it did not know the evidence would be destroyed. As stated above, Myers's third-party defense was not speculative but rather investigated by Officer Espinosa and factually plausible. The bad faith analysis turns not on what the Government did not know, namely, if or when the backpack could be destroyed. Rather, the key is what the Government knew prior to its destruction, namely, the evidentiary value of the

12

backpack to Myers's defense triggered the Government's duty to take steps to preserve it. Three features of this case make the bad faith showing stronger than in *Zaragoza-Moreira*: (1) The evidence was preserved by police officers, who included Myers's defense in his report, indicating the evidentiary value of the backpack; (2) In his email to the prosecutor, the ATF agent referred to the tan backpack as ""[t]he backpack the SBR was located in," indicating that he also understood its evidentiary value; and (3) The prosecutor told the ATF agent to retrieve the "firearms evidence" and either did not mean that term to include the tan backpack or did not send the ATF agent back for it. In other words, three government actors understood the evidentiary value of the tan backpack, but only Officer Espinosa took steps to preserve it.

Here, as in *Zaragoza-Moreira*, Officer Espinoza clearly understood Myers's defense because Myers repeatedly told him that the SBR was not his. In contrast to *Zaragoza-Moreira*, where the border agent failed to preserve video evidence and failed to include the defendant's duress defense in her reports, *Zaragoza-Moreira*, 780 F.3d at 980, Officer Espinosa preserved the tan backpack and mentioned it and Myers's defense in his reports. Myers's statements are captured on the body-worn camera and in Officer Espinosa's report which states that Myers told him that the tan backpack in which the SBR was found belonged to the other man and that Officer Espinosa insisted upon further questioning regarding the backpack. (ECF No. 33-1 at 3-4.) The body-worn camera shows that Officer Espinosa took steps to corroborate Myers's claims by writing down the name of the other man. (ECF No. 33-2 at 48:49-49:03.)

Unlike in *Zaragoza-Moreira*, here the Government also knew, prior to the backpack's destruction, that it had exculpatory value because it was essential to Myers's third-party defense. Here, the record indicates that the Government had Officer Espinosa's arrest report and the body-worn camera videos before January 18, 2023. (ECF No. 83-5 at 3-4.) The report and the videos indicated that on the

13

1 night of his arrest Myers alerted the officers to his defense by repeatedly telling
2 them that the backpack was not his and belonged to the other man. In an email
3 with the prosecutor, the ATF agent confirmed that the evidence vault contained
4 the SBR and "[t]he backpack the SBR was located in." (ECF No. 83-4.) This
5 description reflects that the backpack was potentially useful evidence and Myers
6 clearly asserted it was not his. Neither the ATF agent nor the assigned prosecutor
7 testified at the hearing, so there is no record evidence interpreting or
8 supplementing their brief email thread on this point.

9 Knowing Myers's defense rested on the tan backpack, the USAO in January
10 2023 directed the ATF agent to retrieve the "firearms evidence" from the evidence
11 vault, but not the tan backpack or other items. The ATF agent wrote, "I'm going
12 to RPD to reinspect for any manufacturer markings." (ECF No. 83-4 at 3.) The
13 USAO directed the agent to retrieve (not merely reinspect) the "firearms evidence,"
14 (ECF No. 83-5 at 3; *see also* ECF No. 44-1 at 1), and he did retrieve it. (ECF No.
15 44-1 at 2.) In other words, the Government knew on January 18, 2023, that the
16 firearms and tan backpack were still in the RPD evidence vault. Even accepting
17 that the Government was unaware that the state prosecutor had authorized
18 release of the evidence, the Government directed its agent to retrieve the
19 incriminating "firearms evidence" but not the tan backpack, despite knowing its
20 potential exculpatory value. The backpack and other evidence were destroyed
21 weeks later, in February 2023.

22 In contrast to *Zaragoza-Moreira*, here the potential exculpatory value of the
23 tan backpack was flagged for the prosecution multiple times before it was
24 destroyed: in Officer Espinoza's report, on his body-worn camera, and in the ATF
25 agent's reference to "[t]he backpack the SBR was located in." (ECF No. 83-5 at 3.)
26 In *Zaragoza-Moreira*, the agent hid the exculpatory information from prosecutors
27 until it was too late. Here, the exculpatory value of the tan backpack was known
28 before its destruction, and the Government failed to take steps to preserve it, in

14

bad faith and in violation of Myers's right to due process.

Finally, there is no reasonably available evidence comparable to the destroyed evidence. *Cooper*, 983 F.2d at 931 (holding that, to obtain dismissal for destruction of evidence, the destroyed evidence must be "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means"). The SBR was found in the tan backpack, which Myers claimed did not belong to him. If the backpack had a nametag, patch, or some marking indicating that it belonged to the male passenger, it would have strongly supported Myers's defense. While the potentially exculpatory value of the backpack and its contents was apparent, it bears noting that other destroyed items, namely a black bag, clothes, and two key rings, were objects subject to disclosure under Rule 16(a)(1)(E) and might have tended to support Myers's defense that the SBR was not his, for example, if the clothes did not fit him. Myers was deprived of the opportunity to inspect the tan backpack (and other items) for indicia of ownership, and there is no reasonably available means of replacing that opportunity. *See Zaragoza-Moreira*, 780 F.3d at 981-82 (holding that neither defendant's testimony, nor testimony of two border inspectors who had not directly observed defendant, was comparable to the video evidence that was destroyed). Myers's rights have been violated, and dismissal of the indictment is the appropriate remedy. *See Cooper*, 983 F.2d at 929.

//
//
//
//
//
//
//
//

### III. CONCLUSION

It is therefore ordered that Defendant Kristopher Myers's Motion to Dismiss for Destruction of Evidence (ECF No. 44) is granted.

It is further ordered that Defendant's indictment (ECF No. 1) is dismissed.

It is further ordered that Defendant's Motion to Suppress (ECF No. 33) is denied as moot.

Dated this 17th day of October 2024.

ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE

16